BOBBY STRICKLAND,          *
                          *
          Plaintiff,      *
                          *
     v.                   *          CV 110-114
                          *
                          *
COLUMBIA COUNTY BOARD OF  *
EDUCATION; COLUMBIA COUNTY *
SCHOOL SYSTEM; DEPARTMENT  *
OF TRANSPORTATION;         *
Superintendent of Schools  *
CHARLES R. NAGLE; DEWAYNE  *
PORTER, Director of        *
Transportation; Assistant  *
Superintendent ROBERT      *
JARRELL, and CCBOE         *
Chairman REGINA BUCCAFUSCO; *
CCBOE Vice-Chairman MIKE   *
SLEEPER; CCBOE Member MILDRED *
BLACKBURN; CCBOE Member WAYNE *
BRIDGES; CCBOE Member ROXANNE *
WHITAKER,                  *
                          *
                          *
          Defendants.      *

---

**O R D E R**

---

Presently pending before the Court is Defendants' Motion for Summary Judgment. (Doc. no. 21.) For the reasons set forth below, Defendants' motion is **GRANTED**.

## I. BACKGROUND

On a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party,

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). In the present case, however, most of the operative facts are not in dispute. In fact, while Plaintiff "disputes" many of the facts set forth in Defendants' Statement of Undisputed Material Facts and Conclusions of Law, it appears that Plaintiff is not denying the actual facts but rather the implication of the facts. In other words, Plaintiff "disputes" the legal conclusions to be drawn from those facts as opposed to the accuracy of the facts as stated. Nevertheless, to the extent that there is a genuine issue of disputed *fact*, the Court has construed the facts in Plaintiff's favor.

## A. Factual Background

This case arises from Plaintiff's December 2009 termination from his position as a bus driver for the Columbia County School District ("School District"). The School District hired Plaintiff in 1995 for an indefinite period of time. (Strickland Dep. at 40.) During his time as a driver, Plaintiff worked without an employment contract. (Id.) Plaintiff joined the Transport Workers Local Union No. 279 in December of 2009. (Id. at 36-38.)

He joined the union because he believed that the union "[fought] for what was right for the drivers." (Id. at 29.)[1]

The incident that ultimately led to Plaintiff's termination occurred on the morning of December 2, 2009. The details of the event are largely disputed. At the time, Plaintiff and Ruby Brown, his bus aide, were travelling on their morning route to school with students on board. (Brown Aff. ¶¶ 7, 8.) As Plaintiff's bus approached a railroad crossing, one of the students on board shouted "Railroad – Quiet, please." (Id. ¶ 9.) Although this was common behavior, Defendants contend that Plaintiff became very agitated because of the increased noise. (Id. ¶ 11.) Plaintiff shouted at the students, telling them that talking at a railroad crossing was a federal offense and threatening to take the students to the police station. (Id. ¶ 13.)

Mrs. Brown assured Plaintiff that the situation was under control, but Plaintiff continued to yell at the students. (Id. ¶ 14.) Mrs. Brown claims that she felt the bus swerve and observed Plaintiff holding a clipboard on the steering wheel in an attempt to look down at the seating chart. (Id. ¶ 17.) According to Mrs. Brown, Plaintiff subsequently pulled the bus over and engaged in a

---

[1] Over the course of his employment, Plaintiff was once accused of inappropriately touching a female student on his bus. (Strickland Dep. at 21-22.) Plaintiff, however, claims that he did not intend to do anything inappropriate and merely removed a pen from the female student's lap because it was a safety hazard. (Id.) Plaintiff was not subject to discipline as a result of these allegations. (Id.)

verbal exchange with student "K.B." (Id. ¶ 18.) Mrs. Brown claims that Plaintiff, at this point in the route, was enraged. (Id. ¶ 19.) He was so agitated that it was necessary for her to stand up and block Plaintiff from physically approaching the student. (Id.)

When the bus arrived at the school, Mrs. Brown informed three students that they should quickly exit to avoid a potential confrontation with Plaintiff. (Id. ¶ 21.) As the students proceeded to the front of the bus, Mrs. Brown claims that Plaintiff stood up, blocked the path of the three students, and informed them that they were not allowed to leave. (Id. ¶ 22.) Mrs. Brown once again instructed the three students to exit the bus. (Id. ¶ 23.) According to Mrs. Brown, Plaintiff pushed one student in a very forceful manner. (Id. ¶ 25.) The student stumbled, but did not fall, and Mrs. Brown watched as Plaintiff pushed another female student down into a seat. (Id. ¶¶ 25, 26.)

Mr. Griffin, the school principal, also described the events that occurred on the morning of December 2, 2009. He was inside the school when Plaintiff's bus arrived. (Griffin Aff. ¶ 5.) He claims that four students entered the school in a very agitated state and informed him that he needed to get out to the bus "because something bad [was] about to happen." (Id. ¶ 6.) Mr. Griffin explains that he walked to the bus and, as he approached, witnessed a female student exit the bus in a very rapid manner.

4

(Id. ¶¶ 7, 8.) She was stumbling, and her body was turned to one side. (Id. ¶ 9.) Mr. Griffin claims that he caught the student in order to prevent her from falling to the ground. (Id. ¶ 10.) He asserts that the student was screaming "You'd better tell that man to keep his hands off me!" (Id. ¶ 11.) Mr. Griffin escorted the student into the school and attempted to calm her down. (Id. ¶ 12.)

According to Mr. Griffin, Plaintiff entered the school screaming "I want those kids arrested." (Id. ¶ 17.) Mr. Griffin recalls that Plaintiff's face was very red and that he appeared to be out of control. (Id. ¶¶ 19, 20.) Mr. Griffin told Plaintiff to calm down, informed him that his behavior was inappropriate, and advised him that it was agitating the students. (Id. ¶ 21.) An officer of the Grovetown Police Department arrived at the school, and Mr. Griffin instructed Plaintiff to leave the school immediately or he would have Plaintiff escorted off the premises. (Id. ¶¶ 25, 26.)

Plaintiff, however, disputes the version of events described by Mrs. Brown and Mr. Griffin. He claims that when his bus reached the railroad crossing, one female student began screaming at another child to be quiet. (Strickland Dep. 41.) Despite repeated warnings, the student continued to scream which forced Plaintiff to stop his bus. (Id.) According to Plaintiff, Mrs. Brown informed him that the female student was yelling at a middle

5

school child who would not be quiet at the railroad crossing. (Id.) Plaintiff, satisfied with this explanation, continued with his route. (Id.)

After returning to his seat, Plaintiff received a phone call from the school asking him about the events occurring on his bus. (Id. at 42.) Because he was stopped at a light, Plaintiff answered his phone and explained that he was having problems with the students. (Id.) He learned that a male student on the bus called the transportation department headquarters and told them that Plaintiff was driving unsafely. (Id. at 46-49.) According to Plaintiff, it is quite common for this student to complain to the department. (Id.) After he hung up the phone, Plaintiff heard more noise coming from the back of the bus. (Id. at 43.) He admits grabbing the seating chart attached to his clipboard in an effort to learn which student was making all the noise. (Id.)

Plaintiff further admits that, in an attempt to restore order on his bus, he threatened to call the police. (Id. at 50.) Plaintiff also called Mr. Griffin and asked that he meet the bus when it arrived at the school. (Id.) Plaintiff intended to have two students suspended for safety violations: the female student who yelled at the railroad crossing and the young boy who used his cell phone to call the transportation department. (Id.)

Upon arriving at the school, Plaintiff claims that Mrs. Brown told two female students and a male student to "rush the door."

6

(Id. at 52.) According to Plaintiff, the students opened the door, causing one of the female students to stumble out of the bus in a rapid fashion. (Id. at 53.) Plaintiff denies pushing either student in any way. (Id. at 54.) Plaintiff followed the students off the bus and admits asking the principal to have them arrested. (Id. at 57.)

Dewayne Porter, Transportation Director for the School District, was notified of the events that transpired on Plaintiff's bus. (Porter Dep. at 277; Strickland Dep. at 68.) Porter, Assistant Superintendent Robert Jarrell, and other representatives of the School District subsequently investigated the incident. (Jarrell Dep. at 75-76.) Nine of the students on Plaintiff's bus that morning confirmed that they saw Plaintiff physically push another student down the stairs. Seventeen students confirmed that Plaintiff physically pushed a student into a seat. Ten students confirmed that Plaintiff attempted to read from his clipboard while the bus was in motion. Nineteen students indicated that Plaintiff was yelling, screaming, and appeared to be out of control. (Jarrell Dep. at 75-76.)

Porter reviewed the students' statements as well as the statement of Mrs. Brown. (Porter Dep. at 475-76.) The statements confirmed that Plaintiff acted aggressively towards students and escalated the confrontation. (Id.) Porter also reviewed Mr.

7

Griffin's statement which confirmed that Plaintiff may have pushed a student out of the bus. (Id. at 477.)

Porter met with Plaintiff to discuss the matter. (Porter Dep. at 395.) He informed Plaintiff that he would recommend termination and explained the appeal options. (Strickland Dep. at 71-75.) Plaintiff subsequently met with Jarrell and presented his version of events. (Id. at 77.) Jarrell also recommended termination because he determined that Plaintiff pushed two female students and lost control of his actions while operating his bus. (Id. at 75.) Jarrell noted that, although Plaintiff denied the allegations, the majority of the students on the bus, along with the bus aide, corroborated the events. (Id. at 76.) By letter, Jarrell outlined the appeal process available to Plaintiff.

Superintendent Nagle subsequently reviewed the termination recommendations of both Porter and Jarrell. He also recommended termination because he determined that Plaintiff aggressively touched a student out of anger. (Nagle Dep. at 51) Nagle advised Plaintiff of his right to have the recommendation reviewed by the Columbia County Board of Education (the "Board"). (Id. at 42, 51-52.)

Plaintiff submitted a request to the Board to have the termination recommendations reviewed. (Id. at 53.) Plaintiff also requested that the Board conduct a hearing on his appeal. (Id. at 52.) Superintendent Nagle presented the Board members

with a compilation of documents relating to the termination recommendations. (Whitaker Aff. ¶ 6; Bridges Aff. ¶ 6; Blackburn Aff. ¶ 6; Sleeper Aff. ¶ 6; Buccafusco Aff. ¶ 6.) Superintendent Nagle did not in any way limit the materials that Plaintiff submitted to the Board. (Nagle Dep. at 53.) The Board members reviewed these materials and voted to approve the termination recommendation. (Whitaker Aff. ¶¶ 7, 10; Bridges Aff. ¶¶ 7, 10; Blackburn Aff. ¶¶ 10; Sleeper Aff. ¶¶ 7, 10; Buccafusco Aff. ¶¶ 7, 10.) They also voted to consider Plaintiff's appeal without granting his request for a hearing on the matter. (Id. ¶ 8.) They felt that a hearing was unnecessary because the information they received was sufficient to allow them to make a decision without holding a hearing. (Id.) The Board members terminated Plaintiff's employment because they determined that he inappropriately touched two students and acted in an unprofessional and improper manner in violation of School District policy. (Id. ¶ 10.)

## B. Procedural History

On July 28, 2010, Plaintiff filed a complaint in the Superior Court of Columbia County alleging that Defendants violated his procedural and substantive due process rights by terminating his employment as a bus driver. (Doc. no. 1, Ex. A.) Moreover, Plaintiff alleged that the Board breached a 2007 Settlement Agreement by failing to provide him with an appeal

9

hearing prior to his termination.[2]  (Id.)  Finally, Plaintiff alleged that Defendants retaliated against union employees in violation of the First Amendment.  (Id.)  Plaintiff sought a writ of mandamus to remedy the alleged illegal conduct of Defendants. (Id.)  Defendants subsequently removed this action to federal court on the basis of federal question jurisdiction.  (Doc. no. 1.)

## II. **SUMMARY JUDGMENT STANDARD**

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita, 475 U.S. at 587, and must draw "all justifiable inferences in [its] favor."  Four Parcels, 941 F.2d at 1437 (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.

---

[2]  See infra footnote 10.

1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrate[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to

be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 22.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## III. **DISCUSSION**

### A. **Qualified Immunity**

The individual Defendants claim that they are entitled to qualified immunity on Plaintiff's freedom of association, equal

protection, and due process claims brought pursuant to 42 U.S.C. §
1983. A government official who is sued under § 1983 may seek
summary judgment on the ground that he is entitled to qualified
immunity. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252,
1263 (11th Cir. 2004). It is well established that "[q]ualified
immunity offers complete protection for government officials sued
in their individual capacities if their conduct 'does not violate
clearly established statutory or constitutional rights of which a
reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d
1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457
U.S. 800, 818 (1982)).

To be eligible for qualified immunity, the official must
first establish that he was performing a "discretionary function"
at the time the alleged violation of federal law occurred. Crosby
v. Monroe Cnty., 394 F.3d 1328, 1331 (11th Cir. 2004). Once the
official has established that he was engaged in a discretionary
function, the burden shifts to the plaintiff to show that the
official is not entitled to qualified immunity. Holloman, 370
F.3d at 1264. The Supreme Court has set forth a two part test for
the qualified immunity analysis. "The threshold inquiry a court
must undertake . . . is whether [the] plaintiff's allegations, if
true establish a constitutional violation." Hope v. Pelzer, 536
U.S. 730, 736 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201
(2001)). If no constitutional right would have been violated, it

is unnecessary to continue the qualified immunity inquiry. Saucier, 533 U.S. at 201. "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" Vinyard, 311 F.3d at 1346 (quoting Saucier, 533 U.S. at 201.)

In this case, Defendants were performing a "discretionary function" of their positions when they allegedly violated Plaintiff's constitutional rights, a fact that is not disputed by either party. The burden therefore shifts to Plaintiff to show a violation of his constitutional rights. See Hope, 536 U.S. at 736. As discussed below, Plaintiff cannot establish a constitutional violation, and therefore, the individual Defendants are entitled to qualified immunity.[3]

## B. Claims Relating to Termination[4]

### 1. Violation of the Right to Free Association

Plaintiff, by way of 42 U.S.C. § 1983, alleges that Defendants violated his First Amendment right of freedom of

---

[3] The Court recognizes that it is no longer bound to follow the two-step Saucier analysis for qualified immunity, but instead has flexibility to decide which of the two prongs should be addressed first in light of the circumstances in the particular case at hand. See Pearson v. Callahan, 555 U.S. 223, 224-25 (2009). Under the facts of this case, it was more appropriate to first address the existence of a constitutional violation.

[4] Defendants dedicated a significant portion of their brief to the argument that the lack of a discriminatory animus on behalf of a "final policymaker" or "final decision maker" precludes recovery against any Defendant under § 1983. However, because Plaintiff could not establish any claim under § 1983, the Court did not consider the policymaker analysis.

association.[5]    The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances."    U.S. Const. amend. I.    Implicit in the right to engage in these First Amendment activities is a "corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."    Roberts v. United States Jaycees, 486 U.S. 609, 622 (1984).    To establish a claim under § 1983 for violating First Amendment rights, a plaintiff must show (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law.    Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

Public employees, including Plaintiff, are protected by the right to free association, and the First Amendment prohibits retaliation based on the expression of that right.    Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) ("The Court has made clear that public employees do not surrender all of their First Amendment

---

[5]    Although Plaintiff's Complaint alleges a First Amendment violation generally, it does not appear that Plaintiff is advancing a freedom of speech claim.    Plaintiff asserts that he was terminated because of his participation in the union, not because of any particular speech associated with his union affiliation.    Thus, his claim arises from an alleged violation of his freedom of association rights, not his free speech rights.

rights by reason of their employment."); Smith v. Arkansas State Highway Emps., Local 1315, 441 U.S. 463, 465 (1979) ("The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." (citing Pickering v. Bd. of Educ., 391 U.S. 563, 574-75 (1968))). The right to freely associate, however, is not unqualified. See Garcetti, 547 U.S. at 418 ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

The framework for striking the appropriate balance between a public employee's First Amendment rights and the government's interest in efficiency was established in Pickering v. Board of Education, 391 U.S. 563 (1968). First, a plaintiff must prove that he was engaging in associative activity not in the course of his employment, but rather as a "citizen." D'Angelo v. Sch. Bd. of Polk Cnty., 497 F.3d 1203, 1212 (11th Cir. 2007). Here, Plaintiff's union membership amounts to associative activity as a citizen. See Douglas v. Dekalb Cnty., No. 1:06-cv-484, 2007 WL 4373970, at *3 (citing Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006)). Once a plaintiff has met his burden on this threshold legal issue, a court must determine (1) whether an adverse action occurred, and (2) whether the constitutionally protected association was a substantial or motivating factor in the employment decision. Starling v. Bd. of Cnty. Comm'rs, 602

F.3d 1257, 1261 n. 1 (11th Cir. 2010); Hatcher v. Bd. of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir. 1987). If the employee can meet this burden, the burden shifts to the employer to show that it would have made the same decision, even in the absence of the protected conduct. Douglas, 2007 WL 4373970, at *3.

Based on the evidence presented, there is no need to balance the Pickering factors because Plaintiff's union activity did not form the basis of the termination decision. See Douglas v. Dekalb Cnty., 308 Fed. Appx. 396, 399 n. 1 (11th Cir. 2009) ("Since we are persuaded the adverse employment actions were not motivated by protected union activity, we need not perform a Pickering balancing."); Shahar v. Bowers, 114 F.3d 1097, 1113 (11th Cir. 1997) ("Pickering balancing does not apply where the employee's constitutionally protected conduct did not motivate the employer's decision. In such a case, balancing is not necessary; the employer prevails because the employee has not established the element of causation.") (Tjoflat, J. specially concurring). Although Plaintiff was a union member, the record is rife with evidence that Plaintiff was terminated because he inappropriately touched two students and acted in an unprofessional manner and that he would have been terminated even in the absence of protected union activity.

Before making their termination decisions, Defendants were presented with numerous statements corroborating the allegations

that Plaintiff had pushed two students, read his clipboard while driving, and threatened to have several students arrested. Of the approximately twenty students interviewed, nine students described Plaintiff as having pushed a female student down the stairs of the bus. Seventeen students said that Plaintiff pushed another female student into a seat. Nineteen students described Plaintiff as out of control on the day in question. Ten students indicated that Plaintiff was reading information on a clipboard while driving, which caused the bus to swerve.

Porter's interviews of Mrs. Brown and Mr. Griffin were consistent with the students' statements. Mrs. Brown confirmed that Plaintiff acted "aggressively towards several of the students." (Porter. Dep. at 475.) Mrs. Brown also stated that she felt the bus swerve and observed Plaintiff holding a clipboard on the steering wheel in an attempt to look at the seating chart while driving. (Brown Aff. ¶ 17.) Mr. Griffin stated that a female student exited the bus in a manner indicating that she may have been pushed. (Griffin Aff. ¶¶ 8, 9.) Mr. Griffin explained that he attempted to calm the students down, but his efforts were halted when Plaintiff entered the school shouting that the students should be arrested. (Id. ¶¶ 16, 17.) Mr. Griffin informed Porter that Plaintiff appeared highly agitated and out of control. (Id. ¶¶ 18, 29.) Both Mrs. Brown and Mr. Griffin stated that they had never seen another school district employee lose

18

control in the same manner as Plaintiff. (Brown Aff. ¶ 31; Griffin Aff. ¶ 30.)

Plaintiff contests the veracity of the students' statements and denies ever pushing students on his bus. Moreover, he asserts that the stories must be fabrications because it would have been impossible for him to have opened the door while simultaneously pushing the female students. However, the Court need not address the conflicting versions of what occurred on the bus route. Instead, Defendants need only advance one reason as to why they were justified in terminating Plaintiff, and here they have satisfied this requirement. Mt. Healthy v. Doyle, 429 U.S. 274, 286 (1977). The evidence presented to Porter, Jarrell, Superintendent Nagle, and the Board members suggested that Plaintiff lost control and pushed two female students. He also drove his bus in a reckless manner. This evidence of misconduct demonstrates that Plaintiff was terminated not because of his union affiliation, but instead because he engaged in misconduct that violated a Board policy.

Even if this Court were to balance the Pickering factors, Plaintiff is unable to demonstrate that his union affiliation played a substantial part in the termination decision. In order for Plaintiff to carry his burden on this issue, he must produce "more than a mere scintilla of evidence that [his union affiliation] played a substantial part in the decision not to keep

him on as an [employee]." Bartes v. School Bd. of Alachua Cnty., No. 04-15459, 2005 WL 2764744, at *4 (11th Cir. 2005). Here Plaintiff has not met his burden. Plaintiff asserts that Porter was aware of his union membership at the time he recommended termination. In support of this position, Plaintiff presented evidence suggesting that he informed Porter of his union affiliation prior to his termination and that he wore his union pin during his meeting with Porter. (Strickland Dep. at 85-86.) Porter, however, denies any knowledge of Plaintiff's union affiliation. (Porter Dep. at 274, 276.)

Although Porter may have been aware of Plaintiff's union membership, the union activity did not play a substantial part in the termination recommendation. Porter stated that his recommendation was based on the students' statements, Mrs. Brown's statement, and Mr. Griffin's observation of a child falling off the bus. (Porter Dep. at 287.) He also explained that he would have made the same recommendation even if he was aware of Plaintiff's union affiliation. (Id. at 473.) Moreover, Plaintiff failed to present any evidence that anyone, other than Porter, was aware of his union membership. Both Jarrell and Superintendent Nagle stated that they did not consider whether Plaintiff was a member of the union when making their decisions, and that they were unaware of his union affiliation. (Jarrell Dep. at 86; Nagle Dep. at 50-51.)

Additionally, the five Board members all stated that they based their termination decisions on the compilation of materials presented to them. (Whitaker Aff. ¶ 7; Bridges Aff. ¶7; Blackburn Aff. ¶ 7; Sleeper Aff. ¶ 7; Buccafusco Aff. ¶ 7.) They asserted that they did not consider union affiliation and would have made the same decision had they known Plaintiff was a member of the union. (Id. ¶ 11.) According to the Board members, Plaintiff's conduct constituted appropriate grounds for termination. (Id.) Plaintiff has offered no evidence, other than conjecture, to rebut this testimony.

Based upon the foregoing, the evidence establishes that Plaintiff was terminated because he inappropriately touched two students and engaged in unprofessional conduct during his route. Although Plaintiff denies the events as recounted by the students and school officials, the evidence establishes as a matter of law that Plaintiff was not terminated for his union activity. There is no evidence that any Defendant, other than Porter, was aware of Plaintiff's union affiliation.[6] Moreover, even if Defendants were

---

[6] Plaintiff also argues that a "cat's paw theory" of liability should apply because the School Board approved Porter's termination recommendation without conducting an independent investigation. The cat's paw theory allows a plaintiff to establish causation by showing that the decision maker followed a biased recommendation without independently investigating the complaint against the employee. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). In such a case, the recommender is using the decision maker as a mere conduit, or "cat's paw," to give effect to the recommender's discriminatory animus. Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998).

Assuming that Porter did make his recommendation based on Plaintiff's union affiliation, there is no evidence that Jarrell, Superintendent Nagle, and the Board members acted as "mere conduits" for Porter's discriminatory animus.

21

aware, there is nothing in the record to suggest that Plaintiff's union activity played a substantial part in the termination decision. Thus, Defendants' motion for summary judgment on Plaintiff's freedom of association claim is **GRANTED**.

## 2. Violation of Equal Protection Rights[7]

Plaintiff also asserts that his termination amounted to a violation of his equal protection rights. Specifically, Plaintiff claims that the Board upheld the termination recommendation because of his classification as a union member. The Equal Protection Clause prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XVI, § 1. The Clause embodies the principle that

---

Although these individuals considered Porter's recommendation, they made their employment decisions based on the totality of the circumstances, including an independent review of the record. (Whitaker Aff. ¶ 7; Bridges Aff. ¶7; Blackburn Aff. ¶ 7; Sleeper Aff. ¶ 7; Buccafusco Aff. ¶ 7.) Without evidence that the Board members effectuated Porter's recommendation without conducting an independent review, Plaintiff cannot use the cat's paw theory to establish liability.

[7] Plaintiff did not specifically plead an Equal Protection violation in his complaint. Instead, the complaint raises a breach of contract claim, a due process claim, and a First Amendment claim. Under established Eleventh Circuit precedent, the non-moving party may not assert new claims at the summary judgment stage. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend his complaint through argument in a brief opposing summary judgment." Id. at 1315.

The Court, however, addresses the Equal Protection claim because of its close connection with Plaintiff's Freedom of Association claim. In his complaint, Plaintiff alleges that Defendants took "retaliatory actions against" members of the union. (Doc. no. 1, Ex. A at ¶ 18.) As evidence of retaliation, Plaintiff alleges that union employees were subject to "selective enforcement of work rules, selective implementation of disciplinary actions, undue scrutiny . . ., and selective granting of employment benefits." (Id. at ¶ 19.) These allegations suggest the basis of Plaintiff's retaliation claim was the differential treatment of union members as compared to non-union members. Thus, the Court considered both an Equal Protection claim and a First Amendment claim.

all similarly situated people should be treated alike. City of Cleburn v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish his claim, Plaintiff must show that (1) he was treated differently from others who were similarly situated on the basis of his union activities, and (2) Defendants had no rational basis for the alleged dissimilar treatment. Smith v. Atlanta Indep. Sch. Dist., 633 F. Supp. 2d 1364, 1381 (N.D. Ga. 2009) (citing Cleburn, 473 U.S. at 439-42). "Different treatment of dissimilarly situated persons does not violate the equal protection clause," and courts are obligated to apply the similarly situated requirements with rigor. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007) (citing E&T Realty v. Strickland, 830 F.2d 1107, 1009 (11th Cir. 1987) (internal quotations omitted)).

The Eleventh Circuit has held that when an employee alleges discriminatory discipline, to determine whether employees are similarly situated, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (internal citations omitted).[8] "The most important factors in the disciplinary context

---

[8] The Court is cognizant of the fact that the plaintiff in Maniccia claimed that her termination violated Title VII and that she did not assert an Equal Protection claim pursuant to § 1983. Despite the difference in the claim asserted, the similarly situated standard of Maniccia is applicable in the Equal Protection context. Other courts have applied a similar analysis when determining whether employees were similarly situated for Equal Protection

are the nature of the offenses committed and the nature of the punishments imposed." Id. The quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions. Id.

Plaintiff identifies non-union employees who he believes engaged in conduct that was similar to his, but who received less severe punishments. He points to two specific individuals: Mr. Turman and Ms. Johnson. Mr. Turman was a non-union bus driver accused of pushing another student. According to Mr. Turman, a high school student was cursing and becoming increasingly disruptive. (Porter Dep. at 377.) The student refused to let Mr. Turman pass him, and as a result, Mr. Turman physically moved the student to the side. (Id. at 378.) Porter investigated the incident, but found the witnesses' accounts of the situation to be unreliable. (Id.) After interviewing the students, Porter questioned whether they actually saw anything since they were in the bottom of the stairwell, and there was a barrier between their line of sight and the event they described. (Id.) Porter advised Mr. Turman that touching students in any way can be misinterpreted and result in disciplinary action, but ultimately decided not to recommend discipline at that time. (Id. at 333.)

Ms. Johnson was a non-union bus aide accused of abusing a special needs student on her bus. According to the bus driver on

purposes. See Catlett v. Peters, No. 98-CV-3273, 1999 WL 1269196, at *7-8 (N.D. Ill. Dec. 23, 1999); Grady v. City of Orlando, No. 96-CV-1295, 1998 WL 657663, at *3-4 (M.D. Fla. June 25, 1998).

Ms. Johnson's bus, after the child refused to sit quietly, Ms. Johnson sat next to him and shoved him hard against the window. When she could not get the boy under control, Ms. Johnson was accused of putting him in a headlock. Porter conducted an investigation and interviewed Mrs. Johnson, as well as the driver who made the allegations and teachers from the school that she served. (Porter Dep. at 308.) Ms. Johnson denied putting the student in a headlock. (Id. at 314.) The teachers at the school stated that when dealing with this particular student, Ms. Johnson sat close to him to make him feel more comfortable and prohibit him from harming other children. (Id.) They also complimented Ms. Johnson's ability to handle students with severe behavioral and emotional issues. (Id. at 311.) Porter did not discipline Ms. Johnson because he did not find any evidence suggesting that she acted inappropriately. (Id. at 309.)

Although the individuals identified by Plaintiff were also accused of inappropriately touching students, their misconduct is distinguishable from Plaintiff's misconduct in both quantity and quality. Plaintiff was the only individual accused of reckless driving. Ten students as well Mrs. Brown corroborated the claim that Plaintiff read information on a clipboard while driving and that this conduct caused the bus to swerve. One of the most important responsibilities of a bus driver is to maintain the safety of the students in their care. Plaintiff's alleged

misconduct violates that duty because his reckless driving jeopardized the safety of every student on his bus.

Additionally, Plaintiff was the only driver alleged to have lost control of his actions. Not only did Plaintiff shout at students, but he also threatened to have them arrested. Superintendent Nagle confirmed that he recommended termination in large part because the evidence suggested that Plaintiff "put his hands . . . on students in anger" and that he was "out of control." (Nagle Dep. at 52.) While the Court does not condone the alleged actions of Mr. Turman and Ms. Johnson, their misconduct simply does not rise to the same level as Plaintiff's misconduct.

Here Plaintiff has not presented a valid comparator as a matter of law. He did not identify any similarly situated non-union employees who engaged in misconduct nearly identical to his, but who received less severe disciplinary sanctions. Accordingly, as Plaintiff failed to present proper comparators, he cannot establish that his equal protection rights were violated, and Defendants' motion for summary judgment on the equal protection claims is **GRANTED**. See Harlen Assocs. V. Inc. Vill. Of Mineola, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

## C. Claims Relating to Termination Procedures

### 1. Violation of Settlement Agreement[9]

Plaintiff asserts that the Board's failure to grant his request for an appeal hearing amounted to a violation of the 2007 Settlement Agreement ("Settlement Agreement"). The Settlement Agreement at issue was the result of a prior lawsuit between members of Plaintiff's union and the School District.[10] Plaintiff's claim that the Board violated the Settlement Agreement appears to be twofold. First, the Settlement Agreement stated that School Board counsel would provide an "expanded grievance policy." Plaintiff, however, argues that the Board restricted the grievance procedures instead of expanding them. Second, Plaintiff contends that the Board's failure to provide him a direct appeal and a hearing amounted to a violation of the Settlement Agreement.

In order to understand Plaintiff's contentions, it is necessary to distinguish between the two types of School District employees: certified personnel and classified at-will personnel. (Nagle Dep. at 28-29.) Certified employees include teachers,

---

[9] Plaintiff's breach of contract claim is pursued only against the Board, and not against any individual Defendant. (Joint Stipulations ¶ 7.)

[10] In the prior suit, members of the Transport Workers Union of America, AFL-CIO, and Transport Workers Union Local Union No. 279 filed suit against the Columbia County School District and the members of the Columbia County Board of Education in the United States District Court for the Southern District of Georgia, Augusta Division. The plaintiffs alleged that they were denied the opportunity to speak about certain matters and that they were discriminated against based on their union affiliation. In an effort to mutually resolve the issues without a Court proceeding, the parties agreed to the terms of the Settlement Agreement.

administrators, and certified educators. (Id. at 28.) They hold advanced degrees in education or possess other state certifications. (Id.) Classified at-will employees are non-certified staff including custodians, bus drivers, secretaries, paraprofessionals, and nutrition employees. (Id.) Pursuant to O.C.G.A. § 20-2-211, all certified professional personnel must be issued an annual contract. Classified at-will employees, on the other hand, are not entitled to a contract of employment and are at-will employees. Plaintiff was a classified at-will employee as evidenced by the fact that he was hired for an indefinite period of time and worked without a contract of employment. (Strickland Dep. at 40.)

The School District maintains separate and distinct policies and procedures for certified and classified at-will employees. The policy and procedures applicable to Complaints and Grievances of *certified employees* are coded "GAE." The policy and procedures applicable to the suspension and termination of *classified at-will personnel* are coded "GCK." For ease of reference, the Court will refer to the two categories of employees henceforth as either certified or classified at-will employees, Plaintiff falling into the latter category.

### a. **Policy GAE Does not Apply to Plaintiff**

Under the terms of the Settlement Agreement, the Board stated that it would expand the grievance procedures for classified at-

will employees. The pertinent provision of the Settlement Agreement is as follows:

> In the best interest of all parties and all employees, School Board Counsel will draft an expanded grievance policy (GAE-1)[11] for all classified employees, including employees of the Transportation Department. Pursuant to this expanded policy, classified employees with at least 24 months of continuous service with the Board of Education can appeal to the Board of Education or its Personnel Committee any recommendation to terminate such employee(s) before final action to terminate is taken by the Board. The Administration will continue implementing procedures on due process. The Administration will prepare procedures to define process.

(Doc. no. 39 at 9.)

Prior to the Settlement Agreement, Policy GAE (applicable to certified employees) provided that "when hearing an appeal from a prior level, the local Board of Education shall hear and decide all appeals de novo." (Hobbs Aff., Ex. A.) In promising to expand the grievance policy for classified at-will employees, the Board revised Policy GCK (applicable to classified at-will employees) to provide: "Upon good cause the Board may grant such employees the opportunity of an appeal hearing." (Pl.'s Ex. 44.) Plaintiff's first claim with respect to the Settlement Agreement is that the Board did not provide an "expanded grievance policy." Instead, Plaintiff contends that the implementation of the revised Policy GCK restricted the rights available under Policy GAE

---

[11] The policy that applies to classified at-will employees is actually policy "GCK." The policy was erroneously identified as "GAE1" in the Settlement Agreement. "GAE1" applies to certified employees, and "GCK" applies to at-will, "classified" employees. (Nagel Aff. ¶ 14.)

because classified at-will employees are no longer entitled to an automatic appeal hearing. Stated differently, Plaintiff contends that the revised version of Policy GCK restricts the appeal rights available under Policy GAE such that the Board failed to provide for an "expanded grievance policy" as set forth in the Settlement Agreement.

At the outset, the Court recognizes that Plaintiff's contention presupposes that he was subject to Policy GAE. He was not. In reviewing Policy GAE, the Court notes that it clearly applies only to certified personnel. Not only does Policy GAE reference "certified" employees, but the purpose of the policy is to implement the provisions of O.C.G.A. § 20-2-989.5. (Hobbs Aff., Ex. A.) Subpart (b) of O.C.G.A. § 20-2-989.5 states that it is the duty of local school administrations to "adopt a complaints policy for *certified personnel*." (emphasis added). Second, "termination, non-renewal, demotion, suspension, or reprimand of an employee" are specifically excluded from Policy GAE. Board policies and procedures relating to termination or suspension of *certified* employees carry the descriptive code "GBN." Thus, Policy GAE does not apply to Plaintiff who is a *classified at-will employee* seeking a review of a *termination decision*.

The only policy that is relevant to Plaintiff is Policy GCK, which explicitly references classified at-will employees seeking reviews of termination decisions. Therefore, to the extent that

30

Plaintiff's argument challenges Policy GCK because it restricted Policy GAE in violation of the Settlement Agreement, that argument must fail because Policy GAE and the rights attendant to it are wholly irrelevant to Plaintiff's case.

**b.  Policy GCK Expanded the Grievance Procedure As Required by the Settlement Agreement**

The Court must next consider whether Policy GCK expanded the grievance procedures available to classified at-will employees in accordance with the Settlement Agreement.  Based upon a comparison between the version of Policy GCK in place before the Settlement Agreement and the version revised after the Settlement Agreement, it appears that the Board provided an "expanded grievance policy." Pursuant to the Settlement Agreement, certain classified at-will employees could appeal a termination recommendation before final action was taken.  Further, the Columbia County School Administration agreed to implement procedures on due process.  The Board complied with both provisions of the Settlement Agreement.

First, under the revised version of Policy GCK, classified at-will employees who maintain continuous employment for a minimum of twenty-four (24) months are afforded the right to have their termination recommendations reviewed.  Unlike the version of Policy GCK in place before the Settlement Agreement, the revised version of Policy GCK provides an employee the opportunity to apply for an appeal hearing.  Second, the School District implemented new procedures relating to due process, which is

31

called "Procedure GCK." Procedure GCK describes in detail the process an employee must follow in order to have a termination recommendation reviewed by the Board. Procedure GCK also describes the appeal hearing process should the Board decide to grant a hearing. Therefore, the Board complied with the Settlement Agreement because it expanded the grievance policy for classified at-will employees and implemented Procedure GCK.

### c. The Board Complied with the Provisions of Policy GCK and Procedure GCK

Plaintiff next contends that the Board breached the Settlement Agreement by denying him the opportunity to appeal directly to the Board. In order to resolve this issue, the Court must determine whether the Board complied with the provisions of Policy GCK and Procedure GCK. Pursuant to Policy GCK and Procedure GCK, after a review by the Assistant Superintendent and Superintendent Nagle, the employee has the right to have the termination recommendation reviewed by the Board. (Pl.'s Exs. 44, 45.)

Here, Plaintiff sought review of the recommendations to terminate his employment. Indeed, Plaintiff states that his attorney filed an appeal with the Board. (Strickland Dep. at 78.) He wrote a letter to the Board explaining the incident on his bus and provided his side of the story. (Id. at 79.) This statement was submitted to the Board along with other written materials related to the termination recommendations. (Whitaker Aff. ¶ 6;

Bridges Aff. ¶ 6; Blackburn Aff. ¶ 6; Sleeper Aff. ¶ 6; Buccafusco Aff. ¶ 6.) The Board reviewed those materials and decided to uphold the termination recommendation. (Id. ¶ 10.) Therefore, Plaintiff was provided the opportunity to have his case reviewed by the Board.

In regard to the argument that Plaintiff was entitled to a hearing before the Board under the terms of the Settlement Agreement, this claim must also fail. Plaintiff asserts that he was under the impression that he would be able to speak to the Board and present his side of the story. (Strickland Dep. at 79.) The Board, however, complied with Policy GCK and Procedure GCK when it determined that an appeal hearing was unnecessary. Nothing in Policy GCK or Procedure GCK provides for an unqualified right to a hearing. While Policy GCK and Procedure GCK allow classified at-will employees a right to appeal a termination recommendation, the Board reserves the right to determine whether to conduct hearings on those appeals. (Whitaker Aff. ¶ 16; Bridges Aff. ¶ 16; Blackburn Aff. ¶ 16; Sleeper Aff. ¶ 16; Buccafusco Aff. ¶ 16.) Policy GCK states that "*upon good cause*, the Board *may* grant such employees the opportunity of an appeal hearing." (Doc. no. 64, Ex. 14) (emphasis added).

Moreover, counsel for the Board who negotiated the Settlement Agreement confirmed that, during the negotiations between the parties, the union demanded that certain classified at-will

employees be granted the right to a hearing before the Board in connection with all termination recommendations by the School Superintendent. (Fletcher Aff. ¶ 4.) The Board, however, rejected this request. (Id. ¶ 5.)

Therefore, under the terms of the final Settlement Agreement, the Board reserved the right to determine, on a case-by-case basis, whether to conduct evidentiary hearings on termination recommendations for classified at-will employees. (Id. ¶ 6.) Plaintiff applied for a hearing, and the Board considered his request. (Whitaker Aff. ¶ 5; Bridges Aff. ¶ 5; Blackburn Aff. ¶ 5; Sleeper Aff. ¶ 5; Buccafusco Aff. ¶ 5.) The Board, however, voted to deny Plaintiff's request because they determined that the grounds for the termination recommendation were sufficiently presented to them in written materials, and thus there was no need for a hearing. (Id. at ¶ 8.) Because Plaintiff was not entitled to an automatic appeal hearing, the Board did not violate the Settlement Agreement in failing to grant his request. Thus Defendants' motion for summary judgment on Plaintiff's breach of contract claim is **GRANTED**.

### 2. 42 U.S.C. § 1983 Denial of Procedural Due Process

Plaintiff next claims that his termination amounted to a violation of procedural due process, and he seeks relief pursuant to § 1983. In order to establish a procedural due process violation under § 1983, a plaintiff must show: "(1) a deprivation

of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). Even if Plaintiff alleges and satisfies these elements, he cannot state a federal procedural due process claim if adequate state remedies are available to him. McKinney v. Pate, 20 F.3d 1550, 1562-64 (11th Cir. 1994).

The Fourteenth Amendment protects against the government's deprivation of liberty or property without procedural due process. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972). State law determines whether a public employee has a property interest in his or her job. Bishop v. Wood, 426 U.S. 341, 344 (1976); Barnett v. Housing Auth. of Atlanta, 707 F.2d 1571, 1576 (11th Cir. 1983) (overruled on other grounds). A constitutionally protected property interest is created if there are "rules of mutually explicit understandings that support [a] claim of entitlement." Perry v. Sindermann, 408 U.S, 593, 601 (1972). "To obtain a protected property interest in employment, a person must have more than a mere unilateral expectation of continued employment; one must have a legitimate claim of entitlement to continued employment." Warren v. Crawford, 927 F.3d 559, 562 (11th Cir. 1991). Thus, to evaluate the validity of Plaintiff's procedural due process claim, the Court must first

determine whether he had a protected property interest in his employment as a bus driver with the School District.

Under Georgia law, in the absence of a controlling contract between the parties, employment for an indefinite period of time is terminable at will by either party. Land v. Delta Air Lines, 130 Ga. App. 231 (1973); see also O.C.G.A. § 34-7-1. Moreover, a public employee generally has no property right in such employment. Ogletree v. Chester, 682 F.2d 1366, 1369 (11th Cir. 1982) (citing Barnes v. Mendonsa, 110 Ga. App. 464 (1964)). However, a public employee has a property interest in his job if his employment allows dismissal only for cause. Warren, 927 F.3d at 562. An explicit contractual provision, rules, or common understanding may determine whether an employee is terminable at will or only for cause. DeClue v. City of Clayton, 246 Ga. App. 487, 489 (2000). The expectations of the parties involved are also relevant to this issue. Maxwell v. Mayor & Aldermen of Savannah, 226 Ga. App. 705, 707 (1997).

Plaintiff contends that Policy GCK provided him with a protected property interest. Policy GCK states that the Superintendent can terminate, pending Board approval, "any auxiliary employee who fails to comply with employment expectations and rules, who fails to perform assigned duties, or for any other good and sufficient cause." (Pl.'s Ex. 44) (emphasis added). Plaintiff asserts that, based on this language,

he could only be terminated for cause, and thus he had an expectation of continued employment sufficient to bestow a protectable property interest.

Policy GCK further provides "nothing in this policy shall grant the right to continued employment or change the legal status of at-will employees." (Id.) Procedure GCK contains a similar disclaimer and states that the procedure is merely designed "to give auxiliary employees a fair means to have terminations . . . informally reviewed." (Pl.'s Ex. 45.) Defendants contend that this disclaimer demonstrates that Plaintiff remained an at-will employee and that the School District did not intend to expand the rights of classified at-will employees.

Despite Plaintiff's claim to the contrary, Policy GCK does not grant him a property interest in continued employment because the Superintendent has broad discretion to recommend termination. Although Policy GCK contains "for cause" language, it does not provide that Plaintiff could *only* be terminated for cause. Cf. Glenn v. Newman, 614 F.2d 467, 472 (5th Cir. 1980) (provision that allowed suspension only "for cause" created a property interest).[12] Policy GCK states that the Superintendent may terminate, pending Board approval, "any employee who fails to comply with employment expectations and rules, who fails to perform assigned duties, or

_____

[12] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

for any other good and sufficient cause." (Pl.'s Ex. 44.) The Columbia County Auxiliary Employment Handbook provides a list of ten (10) specific expectations for School District employees. (Pl.'s Ex. 43.) However, the Handbook also states that the guidelines are offered to insure that employees understand expectations for job performance and that they are "not intended to be all-inclusive" because "other specific expectations exist for all positions." (Id.) The fact that the Superintendent could terminate an employee for violating an employment expectation not expressly listed in the Handbook or in Policy GCK demonstrates that he could terminate for reasons other than "good cause." See Warren, 927 F.2d at 563 (finding no property interest because employees could be dismissed at the discretion of the administrator); Georgia Ports Auth. v. Rogers, 173 Ga. App. 538, 539 (1985) (finding no property interest when policy manual's list of reasons for termination indicated that it was not exclusive of other possible reasons). Thus, despite the "for cause" language, Policy GCK places no limit on the Superintendent's ability to determine whether an employee complied with employment expectations and recommend termination based on that decision. See Edwards v. Brown, 699 F.2d 1073, 1076-77 (11th Cir. 1983) (finding no property interest because ordinance placed no limit on the commissioner's discretion to determine whether an employee had fulfilled the standards of "good behavior and efficient service").

38

Moreover, even if the "for cause" language limited the Superintendent's ability to recommend termination, that limitation applies only to the Superintendent and not to the Board. Both Eleventh Circuit and Georgia case law recognize that, under certain circumstances, policies and personnel manuals which include language that an employee may only be terminated "for cause" grant the employee a property interest in continued employment. See Brown v. Ga. Dep't of Revenue, 881 F.2d 1018, 1024-25 (11th Cir. 1989) (finding state granted a property interest by providing that permanent status employees may not be fired except in accordance with the Personnel Board rules); Barnett, 707 F.2d at 1576-77 (noting the personnel policy permitted involuntary discharge only "for cause," which limited the power of the appointing body to dismiss and created a property interest in continued employment); Brownlee v. Williams, 233 Ga. 548, 550-51 (1975)(finding statute that stated that the appointing authority could only dismiss for cause created a property interest in continued employment); DeClue, 246 Ga. App. at 489-90 (holding policy that allowed disciplinary action against employees only for certain specified reasons was evidence that the employee had a property interest in continued employment).

However, Policy GCK is distinguishable from the policies in the above-cited cases. In those cases, the employees had property interests because the "for cause" language curtailed the

*employer's* right to terminate in a substantial way. See <u>Brown</u>, 881 F.2d at 1027 (the for cause language suggested that there was some substantive limitation on the state's ability to terminate covered employees); <u>Barnett</u>, 707 F.2d 1576-77 ("We conclude that, by limiting the power of the appointing body to dismiss an employee, these regulations confer on [the plaintiff] a valid property interest in continued employment."); <u>see also Dethrow v. Parkland Health Hosp. Sys.</u>, No. 3:00-cv-2126, 2002 WL 413905, at *5 (N.D. Tex. March 11, 2002) (finding that in order for an employment policy to alter the at-will nature of employment, "the policy must specifically and expressly limit the *employer's* ability to terminate the employee" (emphasis added)). Under the facts of this case, the Board has the authority to terminate, not the Superintendent. Pursuant to Policy GCK, the Superintendent can *only* recommend termination; the recommendation, however, is subject to Board approval. Moreover, Superintendent Nagle stated that he does not have unilateral authority to terminate any employee, and that this authority rests solely with the Board. (Nagle Dep. at 44.) Thus, unlike the above-cited cases, nothing in Policy GCK limits the Board's (the employer) right to terminate. Because the "for cause" language does not apply to the Board, it does not create a protectable property interest.

Interpreting the "for cause" language as applying only to the Superintendent's termination authority is consistent with the

disclaimer that the policy was not meant to transform the status of at-will employees. The disclaimer affirms the Board's intent that Policy GCK does not alter its legal relationship with classified at-will employees. Therefore, despite the apparent contradiction between the "good cause" language and the disclaimer, the two are reconcilable. The "good cause" language applies only to the Superintendent, while the disclaimer demonstrates that the "good cause" language was not meant to affect the relationship between the Board (the employer) and classified at-will employees. Therefore, Defendants' motion for summary judgment on Plaintiff's procedural due process claim is **GRANTED**.

3. 42 U.S.C. § 1983 Denial of Substantive Due Process

Plaintiff also asserts that Defendants terminated his employment in violation of his substantive due process rights. However, the protection of substantive due process does not apply in the employment law context. Instead, the substantive due process protections of the United States Constitution extend only to certain fundamental rights so "implicit in the concept of ordered liberty" that "no amount of process can justify [their] infringement." Gibson v. City of Gadsden, 377 Fed. Appx. 953, 956 (11th Cir. 2010) (quoting McKinney, F.3d at 1556-57); White v. Hall, 389 Fed. Appx. 956, 959 (11th Cir. 2010). "Because employment rights are state-created rights and are not

41

'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." <u>Gibson</u>, 377 Fed. Appx. at 956. Thus, Defendants' motion for summary judgment on Plaintiff's substantive due process claim is **GRANTED**.[13]

## IV. CONCLUSION

Upon the foregoing, Defendants' Motion for Summary Judgment (Doc. no. 21) is **GRANTED**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia this _29th_ day of March, 2012.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[13] It appears from the parties' briefs that Plaintiff also claims that the denial of a hearing amounted to a violation of his Equal Protection rights. Because Plaintiff failed to present any evidence of similarly situated non-union employees who received a hearing, Plaintiff's claim must necessarily fail.